Thomas Buchele, OSB # 081560
(*Admitted pro hac vice*)
James Saul, OSB # 152809
(*Admitted pro hac vice*)
Earthrise Law Center
10101 S. Terwilliger Blvd.
Portland, Oregon 97219
Buchele: (503) 768-6736
Saul: (503) 768-6929
tbuchele@lclark.edu
jsaul@lclark.edu

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Save the Colorado; Living Rivers; and Center for Biological Diversity,<br><br>Plaintiffs,<br><br>vs.<br><br>United States Department of the Interior; and Deb Halland, Secretary of the Interior,<br><br>Defendants. | No. CV-19-08285-PCT-MTL<br><br>**PLAINTIFFS' STATEMENT OF FACTS** |

Pursuant to LRCiv 56.1, Plaintiffs Save the Colorado, Living Rivers, and Center for Biological Diversity (collectively referred to herein as "Save the Colorado") submit the following Statement of Facts in support of their motion for summary judgment and accompanying memorandum of law.

**STATEMENT OF FACTS**

**I.     Record Facts Supporting all of Plaintiffs' Claims**

1.      This case challenges the U.S. Department of Interior's ("the Department") Record of Decision ("ROD") (AR 000053–248), dated December 2016 for the Glen Canyon Dam Long-Term Experimental Management Plan ("LTEMP"). AR 003511–006058. Published by the Bureau of Reclamation ("the Bureau"), the ROD and its underlying Final Environmental Impact Statement ("Plan FEIS" or "FEIS"), which contains the LTEMP, violate the Administrative Procedure Act ("APA") as well as the National Environmental Policy Act ("NEPA") and its implementing regulations.

2.      Several of Plaintiffs' members have suffered cognizable injuries, fairly traceable to the Bureau's conduct, that are redressable by a favorable judgment from this court. Plaintiffs' members have suffered aesthetic and recreational injuries from their inability to pursue, or diminished enjoyment of, activities such as boating, camping, hiking, swimming, and observing animal species, on or along the Colorado River and its tributaries. Kurtz Decl. at ¶ 13; Beard Decl. at ¶ 16–17; Weisheit Decl. at ¶ 14; Martin Decl. at ¶ 12; Silver Decl. at ¶ 11–12. Plaintiffs' members' injuries arise from changes in flow hydrology, water temperature, and sedimentation resulting from the Bureau's mismanagement of Glen Canyon Dam. Kurtz Decl. at ¶ 11; Beard Decl. at ¶ 15–17; Weisheit Decl. at ¶ 11–12; Martin Decl. at ¶ 12–13; Silver Decl. at ¶ 10. Additionally, if the Bureau had prepared an FEIS for its LTEMP that accounted for the impacts of climate change, it could have developed operational strategies that addressed the deteriorating environmental conditions causing those members' injuries.

**A.     The Colorado River and Glen Canyon Dam**

3.      The Colorado River Basin ("the Basin") is one of the most hydrologically important systems in the world, connecting seven states and serving as a critical source of water for American West. FEIS at 3-1–2 (AR003801–02). The Colorado River flows southwesterly for 1,450 miles, originating in the Rocky Mountains of Colorado and

2

1   terminating at the Gulf of California in Baja, Mexico. FEIS at 3-1 (AR003801). The

2   River not only serves as a source of municipal water for over 40 million people in the

3   surrounding states, but it is also considered the "lifeblood" of twenty-two federal Native

4   American Tribes as well as the numerous natural areas through which it runs. FEIS at 3-

5   2 (AR003802). Additionally, the River is used to irrigate of nearly 5.5 million acres of

6   agricultural lands within the Basin. *Id.*

7          4.      Located on the Colorado River, just south of the Utah-Arizona border, the

8   Glen Canyon Dam was completed by the Bureau in 1963. FEIS at 1-3 (AR003657). The

9   damming of Glen Canyon created Lake Powell, a water storage reservoir with a

10  maximum storage capacity of 24.3 million acre feet (maf), making it the largest unit of

11  the Colorado River Storage Project. FEIS at 3-8 (AR003808).

12         5.      The Dam's construction resulted in both ecosystem changes and physical

13  alternations to the Colorado River. The Glen Canyon Dam creates a barrier which

14  impedes the movement of aquatic organisms, lowers the mean water temperature of the

15  river, reduces both the peak flow of water quantity and the transfer of sediment from the

16  river's upper basin to its lower basin, modifies the composition of riparian vegetation

17  including an increase of non-native vegetation, and restricts the distribution of native

18  fish downstream. FEIS at 3-58–59 (AR003858–59).

19         6.      If Lake Powell drops below a surface elevation of 3,490 feet, Glen Canyon

20  Dam will be unable to produce hydroelectric power. FEIS at 3-9 (AR003809). Although

21  this level may have seemed unlikely when the Dam was originally constructed, it is now

22  a real possibility. Climate change projections forecast a wide range of inflow variations

23  to Lake Powell. These may reach as low as 7 maf annually, which is roughly 1.5 maf

24  lower than lowest mean annual inflow according to historic data. FEIS at 4-416

25  (AR004456).

26         7.      The Department, acting through its sub-agencies the Bureau and the

27  National Park Service ("NPS"), has developed and is presently implementing a new

28  LTEMP for operations of Glen Canyon Dam. FEIS at 1-1 (AR003655). The LTEMP

provides a framework for adaptively managing the Dam for the next 20 years. FEIS at 1-4 (AR003658). The LTEMP and its FEIS were created in response to the need to incorporate scientific information developed since the 1996 ROD into Department decisions on the management of Glen Canyon Dam and the surrounding area. FEIS at 1-6 (AR003660). The LTEMP and its FEIS were also prepared to identify the potential environmental effects of implementing the proposed federal action. FEIS at 1-1 (AR003655). In addition, the FEIS purports to identify and analyze the environmental issues and consequences associated with taking no action, as well as a range of alternatives for implementing the proposed federal action. *Id.*

8.      A number of federal statutes, regulations, treaties, compacts and other legal sources, often collectively referred to as the "Law of the River," govern the Colorado River, including water delivery requirements and the operations of the Glen Canyon Dam. FEIS at 1-29 through 1-31 (AR003683–85). One of the most recent statutes comprising the Law of the River is the Grand Canyon Protection Act of 1992, (Pub. L. No. 102-575)[1], which requires the Bureau to prepare an EIS, consistent with NEPA, to evaluate future dam operations in light of these legal obligations and to submit that NEPA analysis to Congress. *Id.* The Grand Canyon Protection Act thus resulted in the creation of the first EIS for the operation of the Glen Canyon Dam in accordance with NEPA in 1995. FEIS at 1-2 (AR003656). Other parts of the Law of the River predate the existence of the Glen Canyon Dam. FEIS at 1-32 (AR003686, Table 1-2).

9.      Under the Grand Canyon Protection Act, the Secretary of Interior has a duty to "protect downstream resources for future generations." *See* Appendix, Grand Canyon Protection Act at §1802(a) (requiring the Secretary to operate the Glen Canyon Dam "in such a manner to protect, mitigate adverse impacts to, and improve the values

---

[1] The Grand Canyon Protection Act has not been codified in the United States Code. A copy of the Act is filed herewith as part of Save the Colorado's Appendix to its memorandum of points and authorities in support of its motion for summary judgment.

for which Grand Canyon National Park and Glen Canyon National Recreational Area were established including, but not limited to natural and cultural resources and visitor use"). The Act further states that the Secretary of the Interior must "establish and implement long-term monitoring programs." *Id.* § 1805; FEIS at 1-16 (AR003670).

10.     The Grand Canyon Protection Act requires that the Secretary of Energy and the Secretary of the Interior, with input from a variety of stakeholder groups, "identify economically and technically feasible methods of replacing any power generation that is lost through adoption of long-term operational criteria for the Glen Canyon Dam" as required by Sec. 1804 of the Act. Appendix, Grand Canyon Protection Act at § 1809.

11.     Based on the obligations imposed by the Grand Canyon Protection Act, the FEIS issued by the Bureau must ensure that the Glen Canyon Dam's long-term operation is consistent with protecting and mitigating adverse impacts to the Grand Canyon and the Glen Canyon National Recreation Area, including the threats and likely impacts of climate change. *Id.* at § 1802(a).

**B.     The Bureau's 2012 Water Supply and Demand Study**

12.     In 2012, the Bureau published the *Colorado River Basin Water Supply and Demand Study* ("2012 Study") (AR Ref-059373). The 2012 Study's stated purpose was to "define current and future imbalances in water supply and demand in the Basin and the adjacent areas of the Basin States that receive Colorado River water over the next 50 years (through 2060), and to develop and analyze adaptation and mitigation strategies to resolve those imbalances." 2012 Study at SR-1 (AR Ref-059417). The Bureau considered this study to be "the best available science … regarding climate change projections in the Colorado River." FEIS at Q-35 (AR005951). The Study was created with the intention that it be used to inform the LTEMP and FEIS for the Dam, specifically "regarding climate change projections in the Colorado River." FEIS at Q-35 (AR005951). To do this, the Study evaluated the likely range of impacts on water availability in the Colorado River Basin, and projections of climate change modeled

using historical climate trace data-sets sampled from 1906 to 2010. FEIS at 4-5, 4-414, 4-457 (AR004045, 004454, 004497).

13.     The 2012 Study stressed the necessity of managing the Colorado River system in accordance with future projections of both increased demand and decreased water quantity as a result of the environmental impacts of climate change. 2012 Study at SR-77 (AR Ref-059493). The Study begins by underscoring the need for "timely action to ensure sustainability" 2012 Study Forward (AR Ref-059377), before describing "[p]otential future increases in temperatures in the Basin" continuing, accelerating a trend observed over most of the Basin during the past half century. 2012 Study at SR-5 (AR Ref-059421).

14.     Accompanying the predicted temperature increases, the 2012 Study projected that the average yield of the Colorado River could be reduced by up to 20% as a result of climate change. *Id.* at SR-6 (AR Ref-059422). The Study's findings call for decreased annual flow (maf) in the Basin, resulting in water deficits of greater magnitude and longer duration, with deficit spells of five years or longer, i.e. droughts increasing, all with a projected likelihood of close to 50 percent. *Id.* at SR-19 (AR Ref-059435). The Study stated without qualification that "climate experts expect the southwestern United States to be drier in the future and to experience expanded droughts of greater severity than those seen in the past." *Id.* at SR-6 (AR Ref-059422). As a result, the 2012 Study predicts "critical imbalances" regarding the demands currently being put on river resources as early as 2025 due to climate impacts in the Basin. *Id.* at SR-77 (AR Ref-059493).

15.     The 2012 Study presents possible water supply circumstances based upon four projected scenarios: Observed and Resampled; Paleo Resampled; Paleo Conditioned; and the Downscaled General Circulation Models (GCM) Projected (the latter of which is hereinafter called the "Climate Change Scenario"). *Id.* at SR-16 (AR Ref-059432). The Observed and Resampled scenario assumes future hydrologic trends will proceed similarly to the past 100 years of available data. *Id*. The Paleo Resampled

scenario bases its projection upon reconstructed stream-flow rates from the past 1,250 years. *Id*. The Paleo Conditioned scenario uses the same reconstructed flow rates but blends wet and dry states from the record to reflect magnitudes similar to those seen in the past 100 years. *Id*. Finally, the Climate Change Scenario used data from climate projections used in the 2007 Intergovernmental Panel on Climate Change Fourth Assessment Report, which were then corrected for bias and input into the Variable Infiltration Capacity hydrologic model to simulate streamflow. *Id.* The Climate Change Scenario assumes continued warming and uses the downscaled projections to represent possible future precipitation rates. 2012 Study at SR-16–17 (AR Ref-059432–33).

16.     As the scenario which most incorporated climate change data in its projections, the Climate Change Scenario presented the most significant adverse future impacts to the Colorado River and Glen Canyon Dam from climate change. That scenario predicted decreased average stream flow, increased variability in stream flow rates, and shifts in seasonal stream flow as a result of warming trends. *Id.* at SR-18–19 (AR Ref-059434–35). The Climate Change Scenario also indicated that the frequency of water deficit periods lasting longer than 5 years would be 48% over the next 50 years, while the other scenarios suggested considerably lower percentages. *Id.* at SR-18, 21 (AR Ref-059435, Ref-059437). The scenario further estimated that reliability of upper and lower basin water delivery systems would decline as time went on, with 35% of water level traces for Lake Powell expected to be vulnerable to declining below the minimum power pool (MPP) elevation of 3,490 feet, at which point hydropower generation becomes impossible, after 2041. *Id.* at SR-64 (AR Ref-059480). 44% of years between 2041 and 2060 were also projected to be subject to vulnerability for Lake Mead and the lower basin. *Id.* at SR-68 (AR Ref-059484). This in turn reflects the increased possible future likelihood of a compact call between the basins due to declining water levels in Lake Mead.

17.     The 2012 Study stresses that future water resources planning in the Basin "will require careful consideration of the timing, location, and magnitude of anticipated

future Basin resource needs" in order to accommodate the increasingly likely scenario of a future of water scarcity in the Basin driven by climate change. *Id.* at SR-73 (AR Ref-059490). Given the projected wide disparity between future water availability and demand in the Basin, the Study concludes with a "call to action," emphasizing that "all stakeholders that rely on the Colorado River or its tributaries . . . must be involved in considering future options and strategies…" *Id.* at SR-77 (AR Ref-059493).

18.     Despite the alarming water and temperature scenarios projected by the 2012 Study, it explicitly states that certain possible climate change related shifts in demand were not evaluated, including changes to environmental flow requirements due to increased ambient temperature. *Id.* at SR 33 (AR Ref-059449). Thus the discrepancies between water supply and demand could be even larger and more dire than the 2012 Study anticipates if mean temperatures in the basin continue to increase.

### C.     2016 Final Environmental Impact Statement and Record of Decision

19.     On May 9, 2016 Plaintiffs Living Rivers, Center for Biological Diversity, and Save the Colorado submitted a comment letter on the draft environmental impact statement (DEIS) detailing their concern that the Glen Canyon Dam's operations in conjunction with climate change would increase the likelihood of a "compact call" on the Colorado River due to the loss of water by evaporation and seepage at Lake Powell. May 9 Comments at 1–6 (AR010964–69). The comments explained the DEIS did not meet the comprehensive standard required of the project because it lacked an adequate analysis of the impacts of climate change. *Id.* These comments included extensive references to the results of the 2012 Study to emphasize the severity of projected climate realities and the ramifications of the Bureau's failure to give them adequate consideration. May 9 Comments at 3–4 (AR010966–67).

20.     Despite the dire scenario envisioned by the 2012 Study in the Climate Change Scenario and the concerns voiced by Save the Colorado, the full range of projected climate change impacts was not given a full analysis in the FEIS, which

1  instead treated climate change impacts as a mere "uncertainty." FEIS at 4-413

2  (AR004453). Instead of incorporating modern climate science and projections similar to

3  the process used in the 2012 Study, the FEIS relied solely on historical hydrological data

4  to make its climate projections, gathering traces in 20-year segments every five years

5  starting with the earliest historical data in 1906. FEIS at 4-5 (AR004045). Using this

6  method, the FEIS's climate projections were based on a series of trace segments which

7  covers the entire period between 1906 and 2010, with the first segment encapsulating the

8  period of time between 1906 and 1926, and the second trace segment covering the

9  period of time between 1911 and 1931, and so on. *Id.* When the trace segments stretched

10 beyond the 2010 cap, the agency wrapped the data back to the beginning of the record,

11 so that the final trace segment, for instance, would have incorporated the modern data

12 available from 2006 to 2010 as well as the first 14 years of the record between 1906 and

13 1920. *Id.*

14      21.     The Bureau then used the 112 climate projections which formed the basis

15 for the Climate Change Scenario in the 2012 Study to weight the drier trace segments

16 based upon the frequency of their occurrence in those 112 projections. FEIS at 4-414

17 (AR004454). By the Bureau's own admission, this method fails to account for roughly

18 30% of the most severe possible climate scenarios in those 112 projections because

19 those scenarios did not occur in the 21 trace segments which were based only on

20 historical data. *Id.* This is the extent of technical overlap between the 2012 Study and the

21 FEIS. In its response to plaintiffs contained in Appendix Q of the FEIS, the Bureau

22 stated that this depth of analysis of climate change in the basin, and the impacts of the

23 proposed alternatives in light of those changes, was sufficient because of "insufficient

24 data to drive the complex suite of models." FEIS at Q-36 (AR005952).

25      22.     Save the Colorado again submitted extensive comments on the FEIS on

26 November 14, 2016. November Comment at 1–17 (AR001459–75). This detailed

27 comment letter identified five critical issues with the FEIS that needed to be addressed

28 by the Bureau in order to be compliant with NEPA. Save the Colorado identified that the

1    FEIS failed to seriously address the threats of climate change to the Basin and did not

2    include the most up-to-date research in its analysis. November Comment at 2

3    (AR001460). Additionally, Save the Colorado's comments call out the FEIS for failing

4    to include a current economic analysis of the impact of removing hydropower at the

5    Glen Canyon Dam. November Comment at 6–7 (AR001464–65). Finally, the comments

6    identified that the FEIS fails to consider the economic and climate impacts of the

7    LTEMP and its alternatives, which led the FEIS to include an inadequate range of

8    alternatives that would meet the purpose and need of the project. November Comment at

9    11–16 (AR001469–74).

10          23.     Save the Colorado provided the Bureau with multiple scientific studies

11   contravening the agency's conclusions with regards to climate change and projected

12   more severe realities than those contemplated in both the FEIS and 2012 Study. The first

13   studied the future risks of megadroughts, droughts which are of comparable severity to

14   the worst of the 20th century but which last considerably longer, and the variables which

15   can impact their occurrence. AR072144, Toby R. Ault et al., *Relative Impacts of*

16   *mitigation, temperature, and precipitation on 21st-century megadrought risk in the*

17   *American Southwest* 1 (2016). The study's authors found that models, which emphasized

18   precipitation alone, were not likely to reflect the actual likelihood of megadrought

19   occurrence because megadrought conditions were likely to become more frequent as a

20   result of increased temperature from greenhouse gas emissions. *Id.* at 2, 6 (AR072145,

21   072149). The study further suggests that the increased risk of megadrought occurrence

22   would not be reflected in historical data because of shifting atmospheric moisture

23   demand caused by recent climate change trends and that, were those trends to continue

24   unabated, the increased risks of megadroughts from temperature increases alone would

25   push the change of megadrought occurrence to "70, 90, or 99% by the end of the

26   century, even in precipitation increases moderately, does not change, or decreases,

27   respectively." *Id.* at 1 (AR072144).

28          24.     The second study included with Save the Colorado's comments on the

1  FEIS was an informal report issued by the Colorado River Research Group which

2  mirrored the findings of the first study. The report suggested that observed declines in

3  water availability could not be fully explained by changes in precipitation levels alone

4  and were instead likely due to increased temperatures in the Colorado River basin.

5  AR072153, Climate Change and the Colorado River: What We Already Know (2016).

6  The report also questions the comity of the data which the Bureau used in the 2012

7  Study, suggesting that, based upon climate actualities which had occurred since the

8  creation of that data, the conclusions of the 2012 Study regarding declines in streamflow

9  may actually be too optimistic. *Id.* at 1–3 (AR072153–55).

10       25.     Finally, Save the Colorado's comments also included a reference to a then-

11  in-review draft of a study later published by Brandley Udall and Jonathan Overpeck,

12  members of the Colorado Research Group, as well as a presentation made by the authors

13  on the contents of the paper at the Law of the Colorado River conference held in Las

14  Vegas in February of 2016. AR001461. In that presentation, Overpeck warned that the

15  advancement of climate science tended to render even recent projections obsolete as new

16  projections were refined and published. AR071891, 071893. Overpeck warned that what

17  is at one point the worst-case projected scenario may not stay that way for long.

18  AR071893. Overpeck's presentation emphasized the likely and sizeable impact that

19  increased temperature will have on water availability and drought frequency and severity

20  in the Colorado River basin. AR071893. The attached Summary for Decision Makers,

21  which discussed both observed and projected climate impacts on the American

22  Southwest over the last century, explained that increasing temperatures will result in

23  hotter, more severe, and more frequent droughts. AR071899. These 'hot droughts'

24  exacerbate the already dry conditions caused by low precipitation and can even cause

25  anomalously dry conditions despite changes in precipitation. The report also indicates

26  that current projections which purport to measure the risk of megadrought conditions

27  occurring in the 21st century severely underestimate that risk. AR071892.

28       26.     The Bureau's response to Save the Colorado's comments on the FEIS did

1   not address the scientific developments raised in the comment letter or the enclosed

2   studies, and instead claimed that the Bureau's 2012 Study was "still relevant to the

3   analysis of the impacts of the LTEMP over the next 20 years." FEIS at D-5 (AR000132).

4         27.     The FEIS did not heed the warnings of the Bureau's 2012 Study, and

5   lacked changes to the management of Glen Canyon Dam aimed at addressing the

6   impacts of climate change and the likely future disparity between water supply and

7   demand in the Basin. The FEIS failed to consider climate change-focused alternatives

8   and did not account for the updated more dire projections of climate impacts on the

9   Basin in its analysis of the included alternatives. FEIS at 2-8, 2-20, 2-23, 2-41, 2-72, 2-

10   80, 2-81 (AR003700, 003712, 003715, 003733, 003764, 003772, 003773).

11         28.     On December 15, 2016, Secretary of the Interior Sally Jewell signed the

12   Record of Decision on the FEIS and the LTEMP. ROD at 22 (AR000075).

13

14      **D.**     **Climate Change Alternatives Analysis in the FEIS and LTEMP**

15         29.     Pursuant to CEQ regulations, an agency must analyze the environmental

16   consequences of proposed actions on the affected environment, including cumulative

17   and indirect impacts. 40 C.F.R. §§1502.15, 1502.16, 1502.7, 1502.8 (2016).[2]

18         30.     CEQ has made clear that "climate change is a critical environmental issue,

19   and its effect fall squarely within NEPA's purview."[3] Thus, federal agencies, when

20   performing NEPA analysis of an action's environmental consequences *must* "take into

21

22      [2] Save the Colorado cites to the Council on Environmental Quality's NEPA regulations that were in force when the FEIS and ROD were finalized in 2016. Those

23   regulations were subsequently revised, effective on Sept. 14, 2020. 85 Fed. Reg. 43,304 (July 16, 2020). Because the LTEMP and its FEIS were finalized in 2016, before any of

24   these regulatory changes became effective, the Court should apply the earlier NEPA regulations that the Bureau applied to its own NEPA analysis for the LTEMP. *Bair v.*

25   *California Dep't. of Transp.*, 982 F.3d 569, n.20 (9th Cir. 2020).

26      [3] COUNCIL ON ENVTL. QUALITY, EXEC. OFFICE OF THE PRESIDENT, *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas*

27   *Emissions and the Effects of Climate Change in National Environmental Policy Act*

28   *Reviews*, 2 (Aug. 1, 2016), https://ceq.doe.gov/https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf [hereinafter, 2016 GHG Guidance].

1    account the ways in which a changing climate may impact the proposed action and any

2    alternative actions." 2016 GHG Guidance at 9. For example, "a proposed action may

3    require water from a stream that has diminishing quantities of available water" as a

4    result of a changing climate." 2016 GHG Guidance at 21.

5         31.    The FEIS did not include a complete analysis of the ways in which climate

6    change will impact the efficacy of the considered alternatives, nor how various resources

7    will be impacted under prolonged hot drought conditions. FEIS at 2-2 (AR003694).

8    Instead, the FEIS alternatives section makes limited references to how each alternative

9    might contribute to GHG emissions. FEIS at 2-106 (AR003798). However, the section

10   as a whole does not comprehensively evaluate the ways in which climate change itself

11   may impact the resources as part of its alternatives analysis.

12        32.    Additionally, despite acknowledging that climate change poses significant

13   limitations to the "conventional assumption … that the past record of runoff can be used

14   to represent future conditions" FEIS at 3-32 (AR003832), the Bureau relies on historical

15   trace data from the past century to measure the potential climatic impacts on resources in

16   the Basin.

17        33.    In its climate change analysis, the Bureau relied on historic hydrological

18   data to model inflow levels, giving greater weight to historically drier years to "represent

19   their expected increased frequency and occurrence under a climate-change scenario."

20   FEIS at 4-419 (AR004459). The historically derived data was taken from the years 1906

21   to 2010 and was used by the Agencies to create 21 hydrology traces to represent what

22   they call a "range of possible traces from dry to wet." FEIS at 4-365 (AR004045).

23        34.    These historic traces used to model climate change did not represent the

24   "full range of expected inflow variation" nor did they "include the driest traces expected

25   under climate change." FEIS at 4-414 (AR004454). Roughly a third of the distribution

26   of inflow variation was not incorporated into the historic data. *Id.* The FEIS states that

27   the use of historic data led to the underestimation of drier years in climate change

28   modeling. FEIS at 4-365, 4-419 (AR004045, 004459). Thus, the Bureau excluded the

1   most severe projections for Lake Powell's inflow when assessing climate change

2   projections in the FEIS alternatives analysis.

3       35.   The Bureau acknowledged such flaws in its methodology, pointing to

4   "considerable evidence from the paleontological record indicat[ing] that the observed

5   record of the last 100 years does not capture the full range" of hydrologic variability.

6   FEIS at 3-32 (AR003832). Undermining the historical modeling used to assess the

7   impacts is the Bureau's conclusion that "future flows may include periods of wet or dry

8   conditions that are outside the range of sequences observed in the historical record,

9   particularly considering the effects of climate change and the potential for increased

10   hydrologic variability." *Id*

11       36.   The deficiency in the Bureau's climate change analysis is reflected in FEIS

12   Figure 4.16-2 at 4-416 (AR004456):



FIGURE 4.16-2  Mean Annual Inflow Showing the Mean, Median, 75th Percentile, 25th Percentile, Minimum, and Maximum Values for 112 Climate-Change Inflow Traces and 21 Historic Inflow Traces (Means were calculated as the average for all years within each of the traces. Note that diamond = mean; horizontal line = median; lower extent of box = 25th percentile; upper extent of box = 75th percentile; lower whisker = minimum; upper whisker = maximum.)

26       37.   The above figure illustrates the climate change flow projections for Lake

27   Powell on the left and the projections based primarily on historic flows on the right.

28   FEIS at 4-416 (AR004456). The vertical line below the "Climate Change" square

1    represents the 30% of the most severe possible climate scenarios that were excluded by

2    the Bureau's methodology. *See supra* ¶ 19, 20 (citing AR004453–56).

3         38.    The Bureau's analysis treats climate change as a mere uncertainty. FEIS at

4    4-413 (AR004453). According to its analysis, "there could be significant increases in

5    temperature and decreases in water supply" over the next 50 years. *Id*. But, since the

6    "magnitude of these changes is uncertain," they were not seriously considered. *Id.*

7         39.    As a result, the Bureau excluded from its analysis several alternatives raised

8    by commenters that would be more resistant or adaptable to climate change. These

9    include the "Decommission Glen Canyon Dam Alternative," the "Fill Lake Mead First

10   Alternative," and the Run-of-the-River Alternative," all of which seek to avoid or

11   mitigate the impacts of climate change and its projected drought conditions on the

12   Colorado River. FEIS at 2-86–88 (AR003778–80).

13        40.    The Bureau's lack of adequate consideration of climate change and its

14   possible drought impacts are further indicated by its description of the Dam's emergency

15   operations guidelines under each of the alternatives. FEIS at 2-7 (AR003699). There, the

16   FEIS describes how the operators would respond to changes in operations due to

17   systems emergencies such as insufficient generating capacity. *Id.* Despite insufficient

18   generating capacity due to lack of water in the reservoir being a foreseeable outcome of

19   a hot drought scenario, the FEIS specifies that the emergency guidelines for all the

20   alternatives is prepared for such an emergency for only short periods of time "usually

21   less than 4 [hours]." *Id.*

22        41.    Similarly, in its analysis of Alternative D, the preferred alternative, the

23   FEIS states that the Bureau of the Bureau may need to make modifications to the

24   operating plans if "unanticipated or unforeseen" actions are necessary to respond to "low

25   reservoir conditions as a result of drought in the Colorado River Basin." FEIS at 2-48

26   (AR003740). Thus, the FEIS is explicit in the fact that likely future climate change

27   driven droughts were not fully analyzed or planned for in the alternatives stage.

28

1      **E.     The Bureau's Purpose and Need for the LTEMP**

2      42.     Agencies are required to define the purpose and need of a proposed action

3   within an EIS. This statement may not be impermissibly narrow so as to exclude

4   reasonable alternatives from analysis. 40 C.F.R § 1502.13 (2016).

5      43.     The Bureau's purpose and need for the LTEMP was "to provide a

6   comprehensive framework for adaptively managing the Glen Canyon Dam over the next

7   20 years consistent with the GCPA and other provisions of applicable federal law." FEIS

8   at 1-5 (AR003659).

9      44.     The Bureau explains in its purpose and need statement that the need for the

10   proposed action stems from the need to use scientific information developed since 1996

11   to better inform DOI decisions on dam operations and other management and

12   experimental actions in order to meet statutory responsibilities to protect downstream

13   resources for future generations, preserve endangered species, avoid or mitigate impacts

14   on National Register of Historic Places properties, protecting the interests of American

15   Indian Tribes, "*while meeting obligations for water delivery and the generation of*

16   *hydroelectric power.*" FEIS at 1-6 (AR003660) (emphasis added).

17      45.     The statement of purpose and need in the FEIS inexplicably excludes any

18   need to adaptively manage the Dam in response to climate change nor its likely impacts

19   on downstream resources, listed species, historic properties and tribal interests, all of

20   which are all named as resources to be protected in the purpose and need statement. *Id.*

21   Moreover, the statement elevates the need to generate hydroelectric power as a central

22   obligation under the FEIS, despite power generation being merely incidental to the

23   Bureau's primary obligation to protect the resources and water delivery obligations of

24   the region. *Id.*

25      46.     The federal laws directing the management of the Glen Canyon Dam

26   include the Grand Canyon Protection Act (Pub. L. No. 102-575), The Glen Canyon

27   National Recreational Area Designation, Colorado River Compact (1922), Colorado

28   River Storage Project Act (43 U.S.C. 620) Colorado River Basin Project Act (43 U.S.C.

1501 et seq.), and the Upper Colorado River Basin Compact (1948). A specific level of
hydroelectric power production is not required by any of these statutes. In contrast,
climate change and its drought scenarios will clearly impact the obligations these laws
expressly impose on the Bureau.

47.   The Plan FEIS treats the supposed obligation to generate electricity as a
primary purpose of the LTEMP, stating the maintenance or increase of electric energy
generation is an objective of the Plan which served as the basis the formulation and
development of its alternatives. FEIS at 1-11 (AR003665).

48.   In furthering its stated purpose of generating hydropower, the FEIS
"considers operations that can maintain or increase hydropower generation while
protecting and improving downstream resources." FEIS at 1-9 (AR003663). The FEIS
also states "maintain[ing] or increase[ing]" the dam's electric energy generation, load
following capability, and ramp rate capability is an overarching goal for the Project and
was considered "in the formulation and development of alternatives . . . ." FEIS at 1-10–
11 (AR003664–65). The Bureau's commitment to hydropower generation is reflected in
the range of alternatives considered – which aim to minimize the impacts on
hydroelectric power production. FEIS at 2-20, 2-23, 2-43, 2-72 (AR003712, 003715,
003735, 003764). Overall, the differences among all of the alternatives in terms of
average daily power generation was less than 2%. FEIS at 4-335 (AR004375).

49.   Despite the evidence available to the Bureau regarding the impending
impacts of climate change and the likelihood of drought scenarios impacting the
management of Glen Canyon Dam over the course of the next 20 years, neither climate
change nor its associated effects such as increased water scarcity and impacts on the
ability to generate power as a result were included within the project's statement of
purpose and need statement. FEIS at 1-6 (AR003660).

50.   The purpose and need statement does not consider adapting the Dam's
management in accordance with future climate change projections. FEIS at 1-5–6
(AR003659–60). Moreover, the Bureau does not mention the future imbalances of

supply and demand on the Colorado River, examined at length by one of the FEIS's lead agencies through the 2012 Study. Additionally, neither of these topics is included as a listed objective for the project. FEIS at 1-10–12 (AR003664–66). It is impossible to create a "*comprehensive* framework for adaptively managing the Glen Canyon Dam" that fails to account for climate change's impact on the hydrologic conditions of the Colorado River Basin. FEIS at 1-5 (AR003659) (emphasis added).

51.    Instead, the Bureau limits the purpose of the LTEMP to "determine specific options for dam operations, non-flow actions, and appropriate experimental and management actions that will … minimize impacts on resources within the area impacted by dam operations." FEIS at 1-1 (AR003655).

52.    Given both the likelihood of climate change impacting the management required for the operation of the Glen Canyon Dam in the next 20 years and the scope of those impacts on the Colorado River Basin, the Bureau unreasonably narrowed the scope of the purpose and need of the project by including a non-existent obligation of hydropower production while excluding the much more relevant purpose and need of adapting management to the impacts of climate change.

### F.    The Bureau's Range of Alternatives Considered in the FEIS

53.    Agencies are required under NEPA "to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R § 1500.2(e) (2016). In order to be considered reasonable, an alternative must fulfill the project's statement of purpose and need. *Id.*

54.    When selecting the alternatives to be considered in the EIS, the Bureau used an 'alternative screening tool' to "identify specific operational characteristics of alternatives … that would meet the purpose, need, goals, and objectives of the proposed action." FEIS at 2-2 (AR003694).

1    55.    By design, the screening tool eliminated many alternatives immediately –

2  leaving only minor variations of the same action for subsequent analysis. Especially

3  because of the unreasonably narrow statement of purpose and need providing its

4  operational framework, this tool artificially constrained the scope of considered

5  alternatives to ignore climate-related impacts by "focus[ing] on the effects of monthly,

6  daily, and hourly flow patterns in a single year," rather than considering the effects of

7  rapidly increasing resource scarcity over multiple years. FEIS at 2-3 (AR003695).

8    56.    The Bureau developed seven alternatives, including a "No Action

9  Alternative" in the Glen Canyon LTEMP DEIS. FEIS at 2-1 (AR003693). Alternative A

10 (the No Action Alternative) represents continued implementation of existing operations

11 and actions as defined by existing agency decisions. *Id.* The other six "action"

12 alternatives represent various ways in which operations and actions could be modified

13 under an LTEMP. *Id.*

14   57.    The seven alternatives selected by the Bureau for analysis in the EIS had a

15 variety of stated goals including: the continued operation of the Dam under the current

16 management scheme (Alternative A, no action); increasing hydropower generation

17 (Alternative B); adaptively operate Glen Canyon Dam to achieve a balance of resource

18 objectives with priorities placed on humpback chub, sediment, and minimizing impacts

19 on hydropower (Alternative C); adaptively operating Glen Canyon Dam to best meet the

20 resource goals of the LTEMP (Alternative D, preferred alternative); provide for recovery

21 of the humpback chub while protecting other important resources including sediment,

22 the Glen Canyon rainbow trout fishery, aquatic food base, and hydropower resources

23 (Alternative E); provide flows that follow a more natural pattern while limiting sediment

24 transport and providing for warming in summer months (Alternative F); and maximize

25 the conservation of sediment, in order to maintain and increase sandbar size (Alternative

26 G). FEIS at 2-8, 2-20, 2-23, 2-41, 2-72, 2-80, 2-81 (AR003700, 003712, 003715,

27 003733, 003764, 003772, 003773).

28

58.     Here, the Bureau failed to include an alternative that focused on the Dam's operations and the protection of downstream resources under realistic climate change impact projections, which include increased water scarcity and drought. AR003778–80. While several of the alternatives considered resource conservation in their analyses, none were geared towards managing the Dam under a hot drought nor considered the possibility of conditions making sustained hydroelectric production difficult or impossible.

59.     The seven alternatives considered by the Bureau not only prioritize hydropower generation as a primary purpose, but were drafted such that "release patterns could be adjusted to provide ancillary services, including regulation and reserves for hydropower." FEIS at 2-7 (AR003699).

60.     The core action alternatives include an explicit preference for hydroelectric power generation, a monitoring program to identify resource responses to dam operations, and condition-dependent adaptive management strategies designed to adjust dam operations to changing conditions. FEIS at 2-20, 2-23, 2-43, 2-72 (AR003712, 003715, 003735, 003764). Several experimental management proposals were also incorporated into the range of action alternatives, including: high-flow releases for sediment conservation, nonnative fish control actions, conservation measures recommended in previous biological opinions, nonnative plant removal and revegetation with native species, and preservation of historic properties. FEIS at 2–6 (AR003696–98).

61.     The primary difference between the alternatives is the order and priority of objectives. With the individual components that reflect "the full range of environmental resources" addressed under the Bureau's preferred action spread out amongst the other six alternatives, give the appearance of wide-ranging consideration, and concealing the Bureau's predetermined preferences. FEIS at 2-43 (AR003735). In fact the differences in average daily power generation among the alternatives covered a range of less than 2%. FEIS at 4-335 (AR004375).

62.     The Bureau admits as much: its preferred alternative, Alternative D, is "expected to result in an improvement in conditions for humpback chub, trout, and the aquatic food base; have the least impact on vegetation, wetlands, and terrestrial wildlife; improve sandbar building potential and conserve sediment, sustain or improve conditions for reservoir and river recreation; improve preservation of cultural resources; respect and enhance Tribal resources and values; *and have limited impacts on hydropower resources.*" FEIS at 2-43 (AR003735) (emphasis added).

63.     Alternative D, which the Bureau selected as its preferred alternative, results in only slight decreases to Glen Canyon Dam's hydropower production. FEIS at 2-44 (AR003736). Further, it actually results in *increased* greenhouse gas emissions, despite its billing as the environmentally preferable alternative. FEIS at 4-418 (AR004458).

64.     Additionally, the Bureau identified ten alternative concepts brought to its attention during the public scoping period for the LTEMP DEIS but eliminated from detailed study during the FEIS. FEIS at 2-84–86 (AR003776–80). These alternatives were identified as: Decommission Glen Canyon Dam; Fill Lake Mead First; Grand Canyon First; Maximum Powerplant Capacity Operations; Naturally Patterned Flows; Run-of-the-River; Species Community and Habitat-based Alternative; Stewardship Alternative; 12-year Experiment of Two Steady-flow Alternatives; and Year-round Steady Flows. FEIS at 2-1–2 (AR003693–94).

65.     Plaintiffs requested in their comments that the Bureau analyze three of these alternatives in the FEIS, in order to adapt dam operations to the reality of climate change. These included the "Fill Lake Mead First" alternative, the "Run-of-the-River" alternative, and the "Decommission Glen Canyon Dam" alternative. AR001807, 011078, 010964, 001459.

66.     Most of these alternatives or alternative concepts, including the three alternatives specifically proposed or endorsed in Save the Colorado's comments, were not included for analysis in the FEIS. FEIS at 2-86–88 (AR003778–80).

67.     Many of the alternatives eliminated from analysis by the Bureau were either explicitly or implicitly geared towards managing the Glen Canyon Dam more effectively to protect downstream resources under a climate change-induced "hot drought" scenario (i.e., a drought caused or exacerbated by increasing temperatures). Specifically, the Fill Lake Mead First, Run-of-the-River, and Decommissioning Glen Canyon Dam alternatives proposed by Save the Colorado were focused on managing the resources in accordance with projected impacts of climate change. FEIS at 2-87–88 (AR003779–80).

68.     The Fill Lake Mead First proposal allows for the primary water storage to shift from Lake Powell to Lake Mead, making Lake Powell a backup for seasonal and flood control purposes. FEIS at 3-80 (AR003780). This alternative not only reduces water loss from evaporation and seepage, but provides greater flexibility in implementing future Grand Canyon restoration strategies. *Id.*

69.     The Run-of-the-River alternative recommends re-engineering Glen Canyon Dam to operate as a "modified run-of-the-river" facility. *Id.* In addition to several elements from "Fill Lake Mead First," this alternative would restore natural water and sediment flows to the "greatest extent possible," by either reconnecting older river bypass tunnels or constructing newer tunnels that bypass the Glen Canyon Dam. *Id.*

70.     The Decommission Glen Canyon Dam alternative proposes that the Dam be decommissioned. AR003779. Under this alternative, "the dam could be either left in place or removed." *Id.* "If left in place, reservoir levels would be equalized to upstream inflows," causing Lake Powell water levels to drop and allowing the river "to cut new banks and form a new channel that would flow around and through the dam." *Id.*  This alternative would yield recreational benefits for submerged areas along the river, renew access to submerged cultural resources, and allow for the transference of water stored in Lake Powell and Lake Mead to nearby underground aquifers, thereby preventing water loss to evapotranspiration. FEIS at 2-87 (AR003779).

71.     If the Dam were left in place, reservoir levels would be equalized to upstream inflows, allowing Lake Powell's water levels to drop and begin the formation

1   of new banks from the sediment. *Id.* The change in flow would ultimately result in the

2   formation of a new channel around or through the Dam. *Id.* If the Dam were removed

3   entirely, it would reopen currently submerged areas and allow for an increase in new

4   recreational activities. *Id.* Additionally, the environmental, recreational, and cultural

5   resources of Glen Canyon and the Colorado River would be restored to pre-dam

6   conditions, vastly and positively affecting the health of the ecosystem. *Id.*

7       72.     When refusing to consider the Decommission Glen Canyon Dam

8   alternative, the Bureau stated it would not comport to the "purpose, need, or objectives

9   of the proposed action" because it would "not allow compliance with water delivery

10  requirements, including the Law of the River." *Id.*

11      73.      The Bureau has not evaluated how and in what circumstances the proposal

12  would prevent compliance with the Law of the River. *Id.*  Given the future impacts of

13  hot droughts on the basin, it is likely that the preferred alternative will also prevent

14  compliance with water delivery requirements and the Law of the River.

15      74.     When considering the Fill Lake Mead First alternative, the Bureau again

16  denied inclusion by simply asserting that it would "not meet the purpose, need, or

17  objectives of the proposed action," prevent "compliance with water release

18  requirements," and violate the Law of the River. FEIS at 2-88 (AR003780). Under the

19  proposed action, "primary water storage would shift from Lake Powell to Lake Mead,

20  using Lake Powell as a backup for seasonal and flood control purposes." *Id*. By

21  consolidating water storage, the alternative reduces "water lost to evaporation and

22  seepage" and allows for "greater flexibility for implementing Grand Canyon restoration

23  strategies." *Id*. The Bureau does not explain how and in what circumstances the Fill

24  Lake Mead First alternative would violate the Colorado River Compact or the 2007

25  Interim Guidelines. *Id*. Instead, it merely asserts that this is the case. *Id*. Without

26  considering the of climate-induced evapotranspiration on dam operations, it would have

27  been impossible for the Bureau to give this alternative the consideration it was due.

28

75.     When discussing the key issues of the Dam, the FEIS focuses on "operations that can maintain or increase hydropower production while protecting or improving downstream resources." FEIS at 1-9 (AR003663). The FEIS also states "maintain[ing] or increase[ing]" the Dam's electric energy generation, load following capability, and ramp rate capability is an overarching goal for the Project and was considered "in the formulation and development of alternatives . . . ." FEIS at 1-10–11 (AR003664–65).

76.     The Bureau's decision to construe the purpose and need of the project to include the generation of hydroelectric power at current or elevated levels led the agency to reject climate change focused alternatives that did not maintain or increase electricity production. FEIS at 1-6, 1-11–12 (AR003660, 003665–66). In accordance with the project's purpose and need statement, all of the action alternatives analyzed in the FEIS were forecast to achieve average daily power generation within 2% of each other and the no action alternative. FEIS at 4-335 (AR004375).

## II.     Additional Facts Relating to the Bureau's Failure to Prepare a Supplemental Environmental Impact Statement for the LTEMP

77.     The underlying purpose for the LTEMP "stems from the need to use scientific information developed since the 1996 ROD to better inform DOI decisions on dam operations and other management and experimental actions so that the Secretary may continue to meet statutory responsibilities for protecting downstream resources for future generations." FEIS at 1-6 (AR003660).

78.     The Bureau's FEIS expressly admits that the effects of climate change on hydrology and downstream resources "were treated as an uncertainty" rather than addressed "by means of a fully-fledged climate analysis and adaption approach." FEIS at 4-413 (AR004453). Yet, the agency did not supplement its environmental analysis with significant new information, instead stating that its prior analysis was adequate with regard to climate change impacts. ROD at D-5–6 (AR000132–33).

1   79.   On June 21, 2019, Save the Colorado sent a letter to the Bureau asking the

2   agency to prepare a supplemental environmental impact statement ("SEIS") for the

3   LTEMP ("SEIS Letter"). That SEIS Letter explained that new information, including

4   several newly-published scientific articles, "underscore . . . the ways in which climate

5   change will inevitably impact the Dam's operations" and calls to light the extent to

6   which the FEIS fails to consider "alternatives that focus on the protection of downstream

7   resources in light of climate change effects as required by statutory authority."

8   Declaration of Gary Wockner ("Wockner Decl."), ¶ 15 and Ex. 1. That SEIS Letter

9   enclosed six post-FEIS studies pertaining to the impacts of climate change on the

10  Colorado River Basin and Glen Canyon Dam. *Id*. Exs. 2–7.

11  80.   Although the Bureau received the SEIS Letter, it did not respond to it, nor

12  did the Bureau prepare any written document (such as a supplemental information report

13  or "SIR") assessing the significance of the post-FEIS studies enclosed with the SEIS

14  Letter. Declaration of James Saul, ¶¶ 2–4; ECF No. 11, ¶¶ 12, 99; ECF No. 41–3 at 1.

15  81.   Between the publishing of the FEIS in October 2016 and today, climate

16  change has accelerated, with the impacts felt globally, but with particular severity in the

17  Colorado Basin. Declaration of Dr. James L. Powell ("Powell Decl.") at ¶11. 2021 was

18  the fourth hottest year on record in the continental United States; five of the six hottest

19  years on record have occurred since 2015. *Id.*

20  82.   Increased temperatures and decreased precipitation have begun to impact

21  the Colorado River in real-time with the mean discharge of the River at Lees Ferry

22  declining by nearly 20% since 2000. Powell Decl. ¶ 12; Powell Ex. 2 at 5. Between

23  Water Years 2015 and 2021, it declined by 8%. *Id.* The elevation of Lake Powell has

24  fallen from 3606 feet on Oct. 1, 2015, to 3545 on Oct. 1, 2021. *Id.* The elevation of Lake

25  Mead has fallen from 1079 feet on Oct. 1, 2015, to 1067 on Oct. 1, 2021. *Id.*

26  83.   As of August 10, 2021, the combined storage of Lake Powell and Lake

27  Mead was 16.8 maf, or 32% of live capacity. Powell Decl. ¶ 14. The last time the

28

1    combined storage of the two reservoirs was so low was in May 1965, as Lake Powell

2    was filling for the first time. *Id.*

3        84.    "In 2007, the seven Colorado River basin states adopted Interim Guidelines

4    for Lower Basin Shortages and the Coordinated Operations for Lake Powell and Lake

5    Mead." Powell Decl. ¶ 15. "They remain in effect through 2025." *Id*. "The guidelines

6    reflect the dependence of the lower basin states on the Colorado River not only for water

7    supply but also to generate electrical power." *Id*. "The latter requires that Lakes Powell

8    and Mead remain above critical elevations so as to provide adequate head on the

9    generators. *Id.* Under the terms of the Interim Guidelines, a Level 1 shortage in the lower

10   basin occurs when the elevation of Lake Mead falls to 1,075 feet." *Id.*

11       85.    "The August 2021 24-Month Study by the Bureau projected the January 1,

12   2022 Lake Mead elevation to be 1,065.85 feet, leading to the declaration of a "Level 1

13   Shortage Condition," triggering reductions for Arizona of 512,000 acre-feet, about 18%

14   of the state's annual apportionment; and for Nevada: 21,000 acre-feet, 7% of its annual

15   apportionment." Powell Decl. ¶ 16. "A Level 2 shortage would occur if Mead were to

16   fall to 1,050 feet, leading to further cuts for Arizona and Nevada." *Id.*at 7 ¶ 16.

17       86.    "As climate change has continued during the five years since the LTEMP

18   and FEIS was published and river flow and lake levels have fallen," Powell Decl. ¶ 16,

19   the Bureau has not revised its conclusions or conducted an SEIS in response to the

20   dramatic impacts within the Colorado River Basin, instead responding to Plaintiffs

21   comments that the analysis of climate change impacts were adequate. ROD at D-5–6,

22   FEIS at 4-413 (AR000132–33, 004453).

23       87.    The dire nature of climate change for the Colorado River Basin is not only

24   reflected in the conditions on the ground, but also in the latest research and modeling.

25   "To measure the effect of climate change on the flow of the Colorado River, scientists

26   use an equivalent metric called flow sensitivity: the change in the volume of river flow

27   at Lees Ferry [defined at the boundary between the upper and lower Colorado River

28   basins] per degree of temperature rise." Powell Decl. ¶ 19. The most up-to-date

1  modeling for flow sensitivity estimates, relying on empirical historical data that a 1°C

2  rise in temperature in the past caused a drop of 9.3% in river flow. Powell Decl. ¶ 21;

3  Powell Ex. 5 at 3.

4      88.    Using this modeling paired with the projected temperature increases, it is

5  estimated that by mid-century, the flow of the river could drop by from 14% to 31%.

6  Powell Decl. ¶ 22; Powell Ex. 5 at 4. "If both temperature and precipitation were used in

7  the models, the range changed to +5% to -40%, reflecting the greater uncertainty in

8  projecting future precipitation." *Id.* Importantly, the study's authors concluded that

9  "[p]rojected precipitation increases likely will not suffice to fully counter the robust,

10  thermodynamically induced drying. Thus, an increasing risk of severe water shortages is

11  expected." Powell Decl. ¶ 22; Powell Ex. 5 at 1.

12      89.    These projections establish that "the major factor in the decline of river

13  flow is one that could not have been anticipated fully in previous studies but that now

14  must be considered: warming causes reflective snow to melt, which exposes more of the

15  heat-absorbing darker surface, underneath, which increases evapotranspiration (the

16  combined effect of evaporation and transpiration by plants) and reduces the amount of

17  water available to runoff into rivers." Powell Decl. ¶ 22; Powell Ex. 5 at 3.

18      90.    Additionally, new data regarding runoff efficiency in the Colorado River

19  Basin demonstrates that the situation is more severe than contemplated by the Bureau in

20  the FEIS. "Runoff efficiency refers to the ratio of streamflow to precipitation". Powell

21  Decl. ¶ 26. "The higher the ratio, the more runoff from a given volume of precipitation,"

22  with runoff efficiency declining as temperature increases. *Id.*

23      91.    This dynamic is the basis for the dire "hot drought" scenario which are

24  particularly harmful to the Glen Canyon Dam and Lake Powell and were not considered

25  in the FEIS. Recent studies have shown that "since 1988, flows at Lees Ferry were less

26  than expected for a given amount of winter precipitation, and this was the case both in

27  years of high and low flows." Powell Decl. ¶ 26; Powell Ex. 7 at 1. This points to

28  temperature, in addition to precipitation, operating as a major driver of river flow, with

1   warm temperatures capable of exacerbating a modest precipitation drought. Powell Decl.

2   ¶ 25. The studies show that temperature increases in the Basin caused "substantial"

3   reductions in runoff efficiency, describing the reductions in flows as the "largest

4   documented temperature related reductions since record keeping began." Powell Decl. ¶

5   26; Wockner Decl. Ex. 4.

6       92.    Finally, data and modeling in the years following the SEIS has shifted

7   experts understanding of the relationship between temperature and precipitation in

8   Colorado River Basin such that an SEIS is necessary. The West is experiencing what is

9   being called the "Millennium Drought," now in its 21st year. Powell Decl. ¶ 29. This

10  long running drought has occurred in conjunction with a period of rising temperatures,

11  with studies finding at least one-sixth to one-half of the 19% drop in the flow of the

12  Colorado River from 2000 to 2014 was due to a rise in temperature 0.9% above the

13  1906-1999 average. *Id;* Wockner Decl. Ex. 2. Using temperatures projected from

14  climate models, it is forecast that by 2050 the Colorado flow could drop by 20% or

15  more. Powell Decl. ¶ 29. "If these declines took place under drought conditions like

16  those of the present, they report that the decline would be 30%, or about 4.5 maf,

17  California's share of the river." Powell Decl. ¶ 29. "A decline that even approaches that

18  amount of water would be a catastrophe for the tens of millions who depend on the

19  Colorado River for water and power." *Id.*

20      93.    This scenario is described as "hot drought," distinct from droughts of the

21  20th Century which were caused by a decline in Upper Basin precipitation, while

22  temperature remained more or less unchanged. Powell Decl. ¶ 30. In the Millennium

23  Drought, the opposite is occurring: precipitation has remained roughly constant while

24  temperatures rise. *Id.* These results, led the study's authors to conclude that "future

25  climate change impacts on the Colorado River flows will be much more serious than

26  currently assumed, especially if substantial reductions in greenhouse gas emissions do

27  not occur." *Id.* The FEIS does not account for these studies, which call for more dire and

28

immediate impacts to be experienced in ways that could jeopardize the Dam's ability to function.

Dated: January 26, 2022.

s/ Thomas Buchele
Thomas Buchele

s/ James Saul
James Saul
Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219

*Attorneys for Plaintiffs*

29